Filed 12/11/20  P. v. Eads CA4/2
*See concurring opinion.*

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074967 |
| v. | (Super.Ct.No. RIF102809) |
| JEROME DEAN EADS, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Ronald L. Taylor, Judge. (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed

Jerome Eads, in pro. per.; and James M. Kehoe, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

1

## STATEMENT OF THE CASE

On November 15, 2002, an information charged defendant and appellant Jerome Dean Eads, Jr., and codefendant Billy Paul Juarez[1] with the murder under Penal Code[2] section 187, subdivision (a), of Mario Gutierrez, Sr. (count 1). The information also charged defendant with felon in possession of a firearm (a shotgun) under section 12021, subdivision (a)(1) (count 2).

Moreover, the information alleged that defendant suffered two prior convictions: (1) possession of a controlled substance under Health and Safety Code section 11383, subdivision (a), a felony; and (2) assault with a deadly weapon under Penal Code section 245, subdivision (a)(1), a felony.

After a jury trial, on July 8, 2005, defendant was found guilty on both counts— first degree murder (§ 187, subd. (a)) and a felon in possession of a firearm (§ 12021, subd. (a)(1)). The jury also found that a principal was armed with a firearm during the commission of the murder (§ 12022, subd. (a)(1)). In a bifurcated proceeding, the trial court found that defendant had served a prior prison term (§ 667.5, subd. (b)); had been convicted of a strike offense (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)); and had a prior serious felony (§ 667, subd. (a)). Thereafter, the trial court sentenced defendant to prison for 57 years to life.

---

[1] Juarez is not a party to this appeal. Alberto Saa was also a codefendant; he is not a party to this appeal.

[2] All further statutory references are to the Penal Code unless otherwise specified.

Defendant appealed from his conviction. On October 24, 2007, in an unpublished opinion, we affirmed the judgment. (*People v. Saa* (Oct. 24, 2007, E038911) [nonpub. opn.].)

On January 16, 2019, defendant filed a petition to vacate his murder conviction and for resentencing pursuant to section 1170.95. In his petition, defendant provided the following supporting statement: "Petitioner was convicted under the felony murder rule and the natural and probable consequences doctrine. Petitioner fits the criteria for relief under the newly added Penal Code §1170.95." On February 28, 2020, at the hearing on the petition, the People stated: "We'd like to make a motion to dismiss the petition. This was a three-defendant case, but natural and probable consequence instructions were only given as to the codefendants. According to the appellate opinion that's available in Westlaw, a 2007 WL3089592, [defendant] had not only the motive and expressed intent, but he was the actual shooter. Being the actual killer disqualifies him for relief." The court agreed with the prosecutor and denied defendant's petition.

On March 17, 2020, defendant timely filed his notice of appeal.

## STATEMENT OF FACTS[3]

"A.    EVENTS PRECEDING THE MURDER

"In late November 2001, Gutierrez got into a fight with Kathy Double, then his girlfriend, and knocked her across the kitchen. She asked Eads to come over, but when

---

[3] The facts in this section are taken from our prior unpublished opinion (*People v. Saa*, *supra*).

Eads arrived, Gutierrez told him Gutierrez did not want him around. Gutierrez and Eads had a brief fight. Double broke up with Gutierrez and a month or so later, she became Eads's girlfriend. Gutierrez was very jealous of Eads.

"In January 2002, Double and Eads went to the home of Gutierrez's sister, not knowing Gutierrez would be there. Gutierrez 'sucker punched' Eads, and Gutierrez and his son, Martin Gutierrez (Martin), jumped on Eads, knocking him to the ground. Gutierrez and Martin hit and kicked Eads, and it took four people to pull Gutierrez and Martin off Eads. After the fight, Eads's mouth and nose were bleeding and his eye was swollen. Eads said to Gutierrez in a loud voice something like, 'You're dead, motherfucker,' and 'I'm going to kick your ass.' Eads and Double broke up their relationship that day.

"Double later told an investigator that Eads told Double she should have stopped the fight by running over Gutierrez with their truck. However, at trial, Double did not recall making that statement to the investigator.

"After the fight, Eads went to a convenience store with bruises on his face. He told the clerk, who knew Gutierrez, that Gutierrez and his son had beaten him and that 'Everybody in that house are [sic] going to be sorry.'

"Eads told his roommate, Jennifer DeGoede, that Gutierrez had beaten him up, and he wanted to retaliate. Eads was upset and agitated.

"Eads also told another person that Eads had been in a fight with Gutierrez. Eads looked like he had recently been beaten up. Eads called Gutierrez by racial epithets and said he was going to beat Gutierrez and kill him.

4

"B.    EVENTS THE NIGHT OF THE MURDER

"In February 2002, Eads was living with his then girlfriend, Jennifer DeGoede, in a converted garage on property owned by Steven Syndell. [Codefendant] Saa and his 14-year-old girlfriend, April P., lived in a trailer on the same property; Syndell and his family lived in another trailer on the same property.

"In the evening of February 28, 2002, Eads, DeGoede, Saa, [codefendant] Juarez, April P. and Syndell were at Eads's home using methamphetamine. Saa and Eads had been long-time friends. April P. heard Juarez and Eads talking, and she asked them where they were going. They said they were going to give Gutierrez 'an old-fashioned ass-whopping.' Eads asked Juarez to do the 'ass-whopping,' and Juarez said he would do so. Saa agreed to drive Eads and Juarez.

"April P. saw a shotgun and asked what it was for. Saa said it was '[f]or protection.' April P. saw someone load the gun, but she did not remember who had done so. She had earlier told an investigator that Juarez had loaded the shotgun.

"DeGoede also heard Eads and Juarez discuss having Gutierrez beaten up. She told Eads not to do it because it would cause more problems. Eads told her he just wanted done to Gutierrez what Gutierrez had done to him. Saa and Juarez seemed to be 'egging' Eads on.

"Sometime prior to February 28, at Eads's request, Syndell had cut off part of the barrel of the shotgun, and Syndell had been storing the gun for Eads. Eads had asked for the shotgun that day, and Syndell had given it to him. Sometime after 2:30 a.m. on March 1, Eads, Juarez, and Saa left Eads's house in Juarez's car with Saa driving.

5

"Gutierrez lived in a travel trailer about 10 minutes away from Eads's home. His son, Mario . . . lived in a small house on the same property. At about 3:00 a.m. on March 1, Mario was awakened by the sound of a shotgun. His uncle ran in and said that something had happened to Mario's father. Mario ran to his father's trailer and saw his father lying on the ground next to the door. Gutierrez was dead.

"Gutierrez was killed by a shotgun wound that entered the left breast area and exited through the back. Based on that facts that a piece of shotgun wadding fell from Gutierrez's back when his body was rolled over and that his shirt had powder burns, an investigator concluded that Gutierrez had been shot at close range, probably within 12 inches. The pathologist also stated his opinion that the fatal shot had been fired at close range.

"Sheriff's deputies saw blood spatter around Gutierrez's bed and found a shotgun slug in the wood trim above the bed. Based on the location of the slug and the position of Gutierrez's entry and exit wounds, an investigator concluded Gutierrez had been shot while he was in bed.

"Investigators found two billy clubs at the scene; one was on the ground near Gutierrez's body, and the other was underneath his mattress. Gutierrez's sons testified that their father kept a stick in his trailer for protection, but the billy club found on the ground did not belong to their father. The lock on Gutierrez's trailer door was broken, and the door could not be locked.

6

"C.    POSTMURDER EVENTS

"Eads, Juarez, and Saa returned to Eads's home on March 1 ten to twenty minutes after they had left.  April P. said that Juarez was smiling and had a 'demonlike' look on his face, but Eads and Saa looked scared and nervous and were quiet.

"Sometime after 4:00 a.m. on March 1, Eads knocked on Saa's door, and Saa went outside to talk to him.  When Saa came back in, he told April P. they had to leave; April P. thought he looked 'kind of paranoid.'  Saa and April P. stayed with a friend in Nuevo for about six days.  While they were there, April P. asked Saa about the shotgun, and he told her it had been buried somewhere.  They went from Nuevo to stay at Saa's mother's house in Florida.

"Eads woke up DeGoede at 5:00 a.m. and told her they were going away.  Before they left, Eads received a telephone call, after which he was stressed and in a hurry.  Eads and DeGoede drove to a motel in Sun City and then went to a beer garden in Temecula.  While they were there, DeGoede heard someone say that Gutierrez had been shot.  She asked Eads, 'The one you just wanted beat up?'  Eads replied, '[H]ow dare you . . . think I'm capable of that.'  She asked him if he had anything to do with it, and he replied, 'You don't fucking question me.'

"In a telephone call, Syndell told DeGoede that the police wanted to talk to Eads.  Eads said he did not want to talk to anyone until he had spoken to his lawyer.  Eads telephoned Syndell back and told him to '[s]hut the fuck up.'  The next day, Eads and DeGoede set out driving to the State of Washington.  They discussed going to Canada,

7

but DeGoede told Eads she could not go there because of a prior DUI conviction."

(*People v. Saa*, 2007 Cal. App. Unpub. LEXIS 8591, *3-9.)

## DISCUSSION

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 setting forth a statement of the case, a summary of the facts, and potential arguable issues, and has requested this court to undertake a review of the entire record. Pursuant to *Anders*, counsel identified the following issue to assist the court in its search of the record for error: "Whether the court erred in denying appellant's petition pursuant to section 1170.95?"

We offered defendant the opportunity to file a personal supplemental brief.[4] On August 20, 2020, defendant filed a nine-page typewritten supplemental brief with attached exhibits for a total of 208 pages. In essence, defendant argues that the trial court erred in denying his petition because he was not the actual shooter and the natural and probable consequences instructions were given to all defendants in the underlying case, including defendant. After reviewing the record from the underlying case, we agree with defendant that the natural and probable consequences instructions were given to all

---

[4] On August 13, 2020, defendant filed a motion to substitute appellate counsel. On August 24, 2020, we denied defendant's in pro. per. motion. In his motion, defendant asserted that his appointed counsel's representation was deficient and listed two issues counsel should have raised. In our order denying defendant's motion, we stated: "If the court determines that any of the issues raised in appellant's personal supplemental brief merit further briefing, it will direct appointed counsel to brief them. Therefore, at this time, appellant is not entitled to the substitution of counsel."

defendants. A review of the record, however, shows that the jury convicted defendant based on express malice, and not implied malice under the natural and probable consequence doctrine. The trial court, therefore, properly denied defendant's motion.

" 'A conviction for murder requires the commission of an act that causes death, done with the mental state of malice aforethought (malice).' " (*People v. Roldan* (2020) 56 Cal.App.5th 997, 1002 (*Roldan*).) "In 2018 the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) [(Sen. No. 1437)], which abolished the natural and probable consequences doctrine." (*People v. Murillo* (2020) 54 Cal.App.5th 160, 166 (*Murillo*).)

"Before [Sen. No. 1437], malice could be imputed to an aider and abettor under the natural and probable consequences doctrine. ' " ' "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.' " [Citations.] "Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault." [Citation.] [¶] A nontarget offense is a "natural and probable consequence" of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [Citation.] The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " ' " (*Roldan*, *supra*, 56 Cal.App.5th at p. 1002.)

Therefore, prior to the enactment of Sen. No. 1437, "an aider and abettor who lacked express malice but merely engaged in activity of which murder was a natural and probable consequence could have implied malice imputed to him or her, and could therefore be convicted of second degree murder." (*Roldan*, *supra*, 56 Cal.App.5th at p. 1002.) Sen. No. 1437 "eliminated the natural and probable consequences doctrine for murder entirely." (*Ibid.*)

"To determine whether a petitioner has made a prima facie case for relief under section 1170.95, a trial court may look to the record of conviction and the court file. The contents of the record of conviction defeat a prima facie showing when the record shows as a matter of law that the petitioner is not eligible for relief." (*Roldan*, *supra*, 56 Cal.App.5th at p. 1003.)

Here, the record in the underlying case shows that the jury found codefendant Juarez and codefendant Saa guilty of second degree murder under section 187, subdivision (a). The jury, however, found defendant guilty of first degree murder under section 187, subdivision (a). They jury also found "that in the commission of the offense charged under count 1 of the amended information, the defendant, JEROME DEAN EADS, was a principal armed with a firearm, to wit, a SHOTGUN, said arming not being an element of the above offense, within the meaning of Penal Code section 12022, subdivision (a), subsection (1)."

The jury instruction defining murder stated that "[e]very person who unlawfully kills a [human being] [with malice aforethought], is guilty of the crime of murder in violation of Penal Code section 187. [¶] . . . [¶] In order to prove this crime, each of the

10

following elements must be proved:  [¶]  [1. A human being was killed;]  [¶]  . . .  [¶] 2. The killing was unlawful; and [¶]  3. The killing was done with malice aforethought]."

Malice aforethought was defined as follows:

" 'Malice' may be either expressed or implied.

'[Malice is express when there is manifested an intention unlawfully to kill a human being.]

'[Malice is implied when:

'1.  The killing resulted from an intentional act;

'2.  The natural consequences of the act are dangerous to human life; and

'3.  The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.]"

The jury instruction then stated that "[a]ll murder which is perpetrated by any kind of willful, deliberate and premeditated killing with *express malice aforethought* is murder of the first degree."  (Italics and boldface added.)  However, second degree murder is "the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation."  As to defendant's conviction, the jury verdict stated: "We, the jury in the above-entitled action, find the defendant, JEROME DEAN EADS, guilty of a violation of section 187, subdivision (a), of the Penal Code, MURDER, as charged under count 1 of the amended information, and fix the degree of Murder in the *First* degree."  (Italics and boldface added.)  "A person who kills unlawfully with *implied malice* is guilty of second degree murder."  (*People v. Gonzales* (2012) 54 Cal.4th 643,

11

653, italics added.)  Therefore, defendant was convicted under a theory of express malice, and not implied malice under the natural consequences theory.  Thus, defendant has failed to meet the threshold requirement of showing that he was convicted under a natural and probable consequences theory and the trial court properly denied defendant's section 1170.95 petition.

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error.  We are satisfied that defendant's attorney has fully complied with the responsibilities of counsel and no arguable issue exists.  (*Id.* at p. 126; *People v. Wende*, *supra*, 25 Cal.3d at pp.  441-442.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
Acting P. J.

I concur:

CODRINGTON _____
J.

12

[*P. v. EADS*, E074967]

MENETREZ, J., Concurring.

The appellate review procedures under *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and *Anders v. California* (1967) 386 U.S. 738 (*Anders*), in which we read the entire record ourselves to search for arguable grounds for reversal, apply "only to a defendant's first appeal as of right." (*People v. Thurman* (2007) 157 Cal.App.4th 36, 45; *People v. Serrano* (2012) 211 Cal.App.4th 496, 498; *People v. Cole* (2020) 52 Cal.App.5th 1023, 1032 (*Cole*).) Because this appeal concerns a postjudgment proceeding in which there is no constitutional right to effective assistance of counsel, there is no right to *Wende/Anders* review.

Appellant Jerome Eads's counsel filed a brief raising no issues. Eads was notified and filed a personal supplemental brief. We should address the issues raised in the supplemental brief but should not read the entire record ourselves to look for arguable grounds for reversal. (*Cole*, *supra*, 52 Cal.App.5th at pp. 1039-1040.)

Eads raises the following arguments: (1) The trial court erred by relying on the prosecution's false statement that the jury was instructed on the natural and probable consequences doctrine only as to Eads's codefendants, not as to Eads; (2) the trial court erred by relying on the prosecution's false statement that, according to our opinion on direct appeal, Eads was found to be the actual killer; (3) Eads has new evidence (namely, statements by a codefendant) that he was not the actual killer; (4) because Penal Code section 1170.95 (undesignated statutory citations are to this code) gives him the right to introduce new evidence at an evidentiary hearing, the denial of his petition without an

1

evidentiary hearing was structural error; and (5) trial counsel on Eads's section 1170.95 petition provided ineffective assistance by failing to point out the prosecution's false statements and failing to present argument based on the new evidence.

The first two points are correct. According to our opinion on Eads's direct appeal, the jury was instructed on the natural and probable consequences doctrine as to all three defendants, not just as to Eads's two codefendants. (*People v. Saa et al.* (Oct. 24, 2007, E038911) [nonpub. opn.].) Nothing in our opinion indicates that Eads was, or was found by the jury to be, the actual killer. (*Ibid.*)

Neither of those errors warrants reversal, however, unless they were prejudicial or constituted structural error. Contrary to Eads's argument, denial of a petition under section 1170.95 without an evidentiary hearing is not structural error and is reviewed for prejudice under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Daniel* (Nov. 20, 2020, No. A157422) __ Cal.App.5th __ [2020 Cal.App. Lexis 1111, *8-*13].) That makes sense because even if the trial court committed errors, the record might still confirm that the appellant is ineligible for relief as a matter of law. (See, e.g., *id.* at p. *2.)

Here, the record does confirm that Eads is ineligible for relief as a matter of law. The jury convicted Eads of first degree murder and convicted his codefendants of only second degree murder. The jury therefore did not hold Eads vicariously liable, on a natural and probable consequences theory, for a first degree murder committed by his codefendants, because the jury found the codefendants did *not* commit first degree murder. Thus, regardless of whether the jury convicted Eads as the direct perpetrator or

2

as an aider and abettor, the jury must have found that Eads himself had the necessary mental state for first degree murder. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1120.)

The only theory of first degree murder presented to the jury was willful, deliberate, and premeditated murder. Consequently, Eads's first degree murder conviction means that the jury found that Eads himself acted willfully and with premeditation and deliberation. The finding that Eads acted willfully means that he acted with intent to kill, which means he acted with malice. (§ 188, subd. (a)(1); *People v. Moon* (2005) 37 Cal.4th 1, 29 ["A willful murder is an intentional murder"]; *People v. Mejia* (2012) 211 Cal.App.4th 586, 604 ["'Willful' is synonymous with 'express malice': in other words, a specific intent to kill"].)

Nothing in Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) or its amendments to sections 188 and 189 prohibits a defendant who acts with malice from being convicted of murder. On the contrary, the point of the amendments is to require that a defendant must act with malice in order to be convicted of murder (subject to a narrow exception for felony murder, which is not relevant here). (See § 188, subd. (a)(3).) Before those amendments, a defendant who did not act with malice could have been convicted of murder on a natural and probable consequences theory. That is no longer possible, so in that sense the amendments eliminated the natural and probable consequences theory for murder. But if the defendant acted with malice, then the amendments do not prohibit a murder conviction.

3

Accordingly, because the jury found that Eads acted with malice, he is categorically ineligible for relief under section 1170.95. A petition under section 1170.95 is not a proper procedural vehicle for challenging a murder conviction by attacking a prior factual finding. (*People v. Jones* (2020) 56 Cal.App.5th 474, 489-494 (conc. opn. of Menetrez, J.); see also *id.* at pp. 482-485.) Rather, if Eads wishes to attack the jury's finding that he acted with malice, he remains free to do so by means of a petition for writ of habeas corpus.

Because Eads is ineligible for relief as a matter of law, the trial court's errors in relying on the prosecution's false statements were harmless. Eads's remaining arguments fail for similar reasons: Eads's new evidence that he was not the actual killer is irrelevant because the jury's finding that Eads acted with malice is what renders him ineligible for relief; it does not matter whether he was the actual killer. And Eads's ineffective assistance of counsel claim fails because any errors by counsel were harmless—there is no reasonable probability that Eads would have obtained a more favorable result in the absence of counsel's allegedly deficient performance, because the jury's findings render Eads ineligible for relief as a matter of law.

For all of the foregoing reasons, I concur in the judgment only.

MENETREZ _____

J.

4